**Henry John FERNANDES, et al., Plaintiffs, Appellants,**

v.

**COSTA BROTHERS MASONRY, INC., Defendant, Appellee.**

No. 99–1692.

United States Court of Appeals, First Circuit.

Heard Nov. 2, 1999.

Decided Dec. 29, 1999.

ry failure to rehire. They now appeal from an order granting summary judgment against them. Their appeal requires us to explore how courts charged with resolving discrimination cases should choose between pretext analysis (an approach first limned in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)) and mixed-motive analysis (an alternative approach limned later in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion)). We conclude, as did the district court, that the evidence thus far adduced does not trigger mixed-motive analysis. We also conclude, however, that under a properly performed pretext analysis, the appellants' case should have survived. Consequently, we vacate the judgment and remand for further proceedings.

## I. THE FACTS

As the summary judgment standard demands, we take the facts in the light most hospitable to the appellants, indulging all reasonable inferences in their favor. *See Conward v. Cambridge Sch. ·Comm.*, 171 F.3d 12, 17 (1st Cir.1999). Mindful of this coign of vantage, we deliberately omit from our narrative versions of certain conversations and events that conflict with the appellants' accounts.

In 1995, Stone Building Company secured a contract to construct a new high school in Mashpee, Massachusetts. It engaged Costa Bros. as the masonry subcontractor. Because the job was publicly funded, contractors and subcontractors were told that they had to conform to specific equal employment opportunity (EEO) rules and to issue weekly EEO summaries documenting the number of hours worked by minority employees.

A Portuguese immigrant, Domingos DaCosta, owns Costa Bros. On November 13, 1995, he retained Sebastian Ceribelli, a

Renee J. Bushey, with whom Michael A. Feinberg and Feinberg, Charnas & Birmingham, P.C. were on brief, for appellants.

Richard W. Gleeson, with whom Gleeson & Corcoran was on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

SELYA, Circuit Judge.

Henry John Fernandes, Richard H. Gilbert, and Benjamin G. Rose, all dark-skinned Cape Verdeans,[1] sued their quondam employer, Costa Brothers Masonry, Inc. (Costa Bros.), alleging a discriminato-

---

1. Cape Verde is a strand of islands off the west coast of Africa. Historically a Portuguese colony, it proclaimed its independence on July 5, 1975.

Brazilian, as the masonry foreman for the Mashpee project. DaCosta and Ceribelli then hired a number of masons and laborers to work on the job. Those engaged on November 27 included five masons—the appellants and two white males, George Choquette and George Medeiros—and a dark-skinned Cape Verdean laborer, Glenn Spinola. These six men worked as a team until December 7, when Ceribelli laid off all six due to winter weather conditions and lack of heat in the workplace. He vowed that he would recall them when the heating quandary had been solved. Other workers were laid off at roughly the same time (although some, unlike the appellants, were assigned to ongoing Costa Bros. projects elsewhere).

On or about December 13, Costa Bros. resumed work on the Mashpee project. It recalled some masons (but not the appellants). Gilbert visited the job site the following week and asked Ceribelli when he would be rehired. Ceribelli responded, "The way things are going now ... I wouldn't count on it."

Rose sojourned to the site the next Saturday. He noticed masons working there and queried DaCosta about this circumstance. DaCosta replied, "We're doing a little fixing up here." Rose then asked, "Are we going to get called back?" DaCosta responded, "We're going to close in"—a comment that Rose reasonably took to mean that the building would be enclosed in order to create a heated space in which masons could work.

Having heard nothing further, Rose checked back two weeks later. He saw that the job site was fully heated and asked DaCosta, "Aren't we coming back?"

DaCosta replied cryptically, "Well, I got my men." When Rose inquired about what had happened to the plan to recruit residents and minorities, DaCosta stated, "I don't need minorities, and I don't need no residents on this job. I got my men." Rose complained that DaCosta had "twelve new faces" working on the project, but DaCosta abruptly terminated the conversation.

■ In point of fact, Costa Bros. recalled a total of eighteen workmen (masons and laborers) between December 13 and January 25, and hired ten new ones in that span (none of whom had worked previously for Costa Bros.). All twenty-eight were white males.[2]

Fernandes returned to the job site on numerous occasions in December and January. · Each time, DaCosta told him that there was no work available but to come back again. After several weeks, Fernandes asked Ceribelli why he and the other Cape Verdeans had not been recalled. Ceribelli replied that Costa Bros. "had only hired a few minorities because of local pressure."

On January 30, DaCosta, James Byrne (the clerk of the works), and a representative of the general contractor met with Fernandes, Raoul Galvin (a civil rights activist), and others from the local community regarding Costa Bros.'s compliance with EEO requirements. Galvin noted that Costa Bros. had hired more workers, all of whom were white, but that it had no minorities working at the site. He implored DaCosta to rehire Fernandes because "whatever was going on at the time would stop if he at least put one of [the Cape

**2.** Many of the masons and laborers were of Portuguese extraction. From time to time, Costa Bros. suggests that these employees should be counted as "minorities." In some contexts, persons of Portuguese descent indeed may be classified as members of a minority group. *See* 49 C.F.R. § 26.5 (1999); *see also Cone Corp. v. Florida Dep't of Transp.*, 921 F.2d 1190, 1193 n. 10 (11th Cir.1991). Here, however, the gravamen of the appellants' claim is that Costa Bros. discriminated against them because they were black and Cape Verdean, instead preferring white, non-Cape Verdean workers. Thus, for purposes of this case, we do not consider persons of Portuguese extraction to be "minorities." Rather, we group such persons with other white workers (a grouping that emulates the taxonomy used by Costa Bros. in its EEO reports).

Verdeans] back to work." DaCosta indicated that he would honor this request.

Fernandes reported for duty the following Monday but was informed that there was no work available. This experience was repeated several times. Costa Bros. finally restored Fernandes to the payroll on March 26, albeit as a laborer rather than as a mason. On the same day, Ceribelli warned him to "watch out" because DaCosta was "going to be on [his] back." This prediction proved prophetic: according to Fernandes, DaCosta "followed [him] around," constantly "hollering and screaming" at him.

When Fernandes reported for work the next morning, DaCosta instructed him to get an "F block" (or so he thought). Fernandes was unsure what an "F block" was and asked DaCosta (who, as matters turned out, had wanted a standard "half block"). After castigating Fernandes for his ignorance, DaCosta declared that he was "tired of . . . what's going on between you guys," and voiced the opinion that "[y]ou guys are trying to hurt me." He then proclaimed: "I don't have to hire you locals or Cape Verdean people. This is my business. It belongs to me." At that juncture, DaCosta fired Fernandes.

## II. TRAVEL OF THE CASE

After pursuing administrative remedies, *see* 42 U.S.C. § 2000e–5(e); Mass. Gen. Laws ch. 151B, § 5, the appellants sued. In their complaint, they alleged discrimination on the basis of race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, and its state-law analogue, Mass. Gen. Laws ch. 151B, § 4(1). Costa Bros. denied the material allegations of the complaint, and the parties spent the next year conducting pretrial discovery. From the record and the briefs, it appears that the appellants' original claim was constructively amended to include discrimination predicated on national origin, and the case went forward on that assumption.

In due course, Costa Bros. moved for summary judgment, *see* Fed.R.Civ.P. 56, and the appellants filed an opposition. The district court heard oral argument, took the matter under advisement, and thereafter granted the motion as to all claims. In its unpublished rescript, the court characterized DaCosta's statement that "I don't need minorities . . . on this job" as a stray remark, insufficient to trigger mixed-motive analysis. Although the court catalogued DaCosta's comment that "I don't have to hire you locals or Cape Verdean people" in its recitation of the facts, it did not mention this comment thereafter.

Undertaking pretext analysis, the court focused on two white masons who had been hired in January 1996—Piper and Winters. The court ruled that the Piper hiring did not assist the appellants because Piper had special skills and they could not establish that their qualifications were equivalent to his. As to Winters, the court accepted Costa Bros.'s explanation that it had hired him on the recommendation of another employee, characterizing what had happened as cronyism rather than discrimination. The court never discussed whether the record sufficed to support a finding that this explanation was pretextual, nor did it explore the numerous other employment decisions that Costa Bros. made in the December–January time frame. This appeal followed.

## III. DISCUSSION

The appellants asseverate that the district court erred in choosing a legal framework and that, even if the court marched down an acceptable analytic path, it did not stay on track. We consider these arguments in sequence, pausing first to frame the choice-of-approach issue. We then briefly address the appellants' state-law claim.

### A. *The Available Analytic Methods.*

█ A plaintiff alleging disparate treatment under Title VII may proceed on a

mixed-motive approach or on a pretext approach. For purposes of this case, it is important to understand the basic difference between these two modalities.

■■■■ Mixed-motive analysis applies when the evidence shows that an employer considered both a proscribed factor (say, race) and one or more legitimate factors (say, competence) in making a challenged employment decision. *See Price Waterhouse*, 490 U.S. at 241–42, 109 S.Ct. 1775. In that scenario, the plaintiff is not obliged to separate out the relative import of each element that went into the decision; rather, once the plaintiff proves that a proscribed factor "played a motivating part" in the decision, the burden of persuasion shifts to the employer, who will be held liable for damages under Title VII unless "it can prove that, even if it had not taken [the proscribed factor] into account, it would have come to the same decision regarding [the plaintiff]." *Id.* at 242, 244, 109 S.Ct. 1775. Even then, because Congress has reshaped mixed-motive analysis in certain respects, the employee may be entitled to equitable relief so long as he has proven that the proscribed factor played some part in the decisional calculus. *See* 42 U.S.C. §§ 2000e–2(m); 2000e–5(g)(2)(B); *see also Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 n. 3 (1st Cir.1999); *Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 43–44 (1st Cir. 1998).

■■■■ It is readily apparent that this mixed-motive approach, uncabined, has the potential to swallow whole the traditional *McDonnell Douglas* analysis. To guard against this possibility, the Court restricted its applicability to those infrequent cases in which a plaintiff can demonstrate with a high degree of assurance that the employment decision of which he complains "was the product of a mixture of legitimate and illegitimate motives." *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. 1775. Under this formulation, access to the mixed-motive approach ultimately depends on the quality of the available evidence. Most courts agree that Justice O'Connor's seminal concurrence in *Price Waterhouse* furnishes the best device for testing quality (and, thus, the best roadmap for segregating mixed-motive cases from the mine-run of discrimination cases). After all, when the Supreme Court rules by means of a plurality opinion (as was true in *Price Waterhouse*), inferior courts should give effect to the narrowest ground upon which a majority of the Justices supporting the judgment would agree. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). The O'Connor concurrence fits this profile. Hence, we turn to it.

■■■■ "What is required [to trigger mixed-motive analysis] is ... direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring). Because discrimination tends more and more to operate in subtle ways, direct evidence is relatively rare; when it comes to light, however, a plaintiff can use it to demonstrate "that an illegitimate factor played a substantial role in a particular employment decision." *Id.* at 275, 109 S.Ct. 1775. It follows that plaintiffs may use the *Price Waterhouse* mechanism in disparate treatment cases in which they adduce direct evidence of a discriminatory animus, whereas they must proceed under the conventional *McDonnell Douglas* framework (commonly called "pretext analysis") in all other cases. *See Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996).

■■■■ Under the pretext method, the plaintiff first must establish a prima facie case. *See Texas Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. We shall return to the components of the prima facie case; for now, it suffices to say that this requirement is "not onerous."

*Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. If the plaintiff clears this modest hurdle, the burden of production—but not the burden of persuasion—shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. Once that occurs, the plaintiff must show both that the employer's "proffered reason is a sham, and that discriminatory animus sparked [its] actions." *Conward,* 171 F.3d at 19. To this end, the full panoply of circumstantial evidence is available, including but not limited to "statistical evidence showing disparate treatment by the employer of members of the protected class, comments by decisionmakers which denigrate [persons in the protected group], the incidence of differential treatment in the workplace, and the deployment of . . . replacements." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 824 (1st Cir.1991) (citations omitted). The totality of the evidence then is examined "as part of an aggregate package of proof." *Id.*

■ A plaintiff, uncertain of what discovery will yield or how a judge will react to certain proffers, may elect to proceed simultaneously on both fronts (mixed-motive and pretext), cognizant that the trial court, at an appropriate stage of the litigation, will channel the case into one format or the other. *See Price Waterhouse,* 490 U.S. at 247 n. 12, 109 S.Ct. 1775; *Thomas v. National Football League Players Ass'n,* 131 F.3d 198, 202 (D.C.Cir.1997). Consistent with the O'Connor concurrence, the court typically will make that determination based on the availability or unavailability of direct evidence. *See Taylor v. Virginia Union Univ.,* 193 F.3d 219, 232 (4th Cir.1999) (en banc); *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 181–82 (2d Cir.1992).

■ This ruling can have important effects on the outcome of the litigation. In a mixed-motive analysis, "the burden of persuasion shifts from the employee to the employer, who must then affirmatively prove that it would have made the same decision even if it had not taken the protected characteristic into account." *Ayala–Gerena,* 95 F.3d at 95–96; *accord Price Waterhouse,* 490 U.S. at 246, 109 S.Ct. 1775 (explaining that, under a mixed-motive analysis, "the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another"). This contrasts vividly with pretext analysis, under which the employee retains the burden of persuasion throughout. *See Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 153 (1st Cir. 1990).

## B. *Mixed–Motive Analysis.*

■ With this preface, we turn to the appellants' contention that the lower court erred in eschewing a mixed-motive analysis. Because this case comes to us on appeal from an order granting *brevis* disposition, we afford de novo review. *See Conward,* 171 F.3d at 18.

■ As our earlier discussion indicates, direct evidence is the touchstone for mixed-motive analysis. Hence, the fate of the appellants' present contention hinges on whether they adduced direct evidence of Costa Bros.'s use of a proscribed factor (race, color, and/or national origin) in the decisional process. Answering that question is more difficult than might appear at first blush. To be sure, Justice O'Connor furnished a trenchant, universally accepted example of what is not direct evidence: stray remarks, such as "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring). Since then, however, jurists have struggled in attempting to define the term affirmatively. This operose task not only has divided the courts of appeals but also has created a patchwork of intra-circuit

conflicts. Generally speaking, three schools of thought have emerged.

1. *The "Classic" Position.* Some courts adopt the traditional definition of "direct evidence" for this purpose, holding that the term signifies evidence which, if believed, suffices to prove the fact of discriminatory animus without inference, presumption, or resort to other evidence. *See, e.g., Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1207 (10th Cir.1999); *Haas v. ADVO Sys., Inc.,* 168 F.3d 732, 734 n. 2 (5th Cir.1999); *EEOC v. Wiltel, Inc.,* 81 F.3d 1508, 1514 (10th Cir.1996); *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 40 (5th Cir.1996). Although only the Fifth and Tenth Circuits cling consistently to this view, other tribunals have embraced it periodically. *See, e.g., Carter v. Three Springs Resid'l Treatment,* 132 F.3d 635, 641 (11th Cir.1998); *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994).

2. *The "Animus Plus" Position.* The Fourth Circuit, sitting en banc, recently defined "direct evidence" for this purpose as evidence, both direct and circumstantial, of conduct or statements that (1) reflect directly the alleged discriminatory animus and (2) bear squarely on the contested employment decision. *See Taylor,* 193 F.3d at 232. The D.C. Circuit takes the same view. *See Thomas,* 131 F.3d at 204. The Ninth Circuit seems headed in this direction. *See Lambert v. Ackerley,* 180 F.3d 997, 1008–09 (9th Cir.1999) (en banc), *cert. denied,* — U.S. —, 120 S.Ct. 936, — L.Ed.2d — (1999). The Third Circuit at one time was in the "animus plus" camp, *see Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 513 (3d Cir.1997), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998), but that court is poised to revisit the question. *See Hankins v. City of Philadelphia,* 189 F.3d 353 (3d Cir.1999), *rehearing en banc granted, opinion vacated,* 188 F.3d 217 (3d Cir. 1999). Two other courts of appeals have indicated occasional approval of this approach, *see, e.g., Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir.1999); *Deneen v. Northwest Airlines, Inc.,* 132 F.3d 431, 436 (8th Cir.1998), but as the cases cited herein indicate, both of these courts have flirted with other formulations. Courts endorsing the animus plus position do not distinguish between direct and circumstantial evidence in the classic sense but, rather, emphasize that the mixed-motive trigger depends on the strength of the plaintiff's case. *See, e.g., Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 553 (4th Cir.1999) (emphasizing that whether a case falls under the mixed-motive or pretext rubric "ultimately hinges on the strength of the evidence establishing discrimination") (citation and internal quotation marks omitted); *Thomas,* 131 F.3d at 204 (similar).

3. *The "Animus" Position.* A few courts resolve the direct evidence conundrum by the simple expedient of deleting the "plus" from the "animus plus" formulation. Those courts opine that as long as the evidence (whether direct or circumstantial) is tied to the alleged discriminatory animus, it need not bear squarely on the challenged employment decision. The Second Circuit advocates this position. *See, e.g., Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir.1997); *Ostrowski,* 968 F.2d at 182. The Eighth Circuit intermittently takes this stance, *see, e.g., Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1017–18 (8th Cir.1999); *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993), and two other cases appear to fit somewhat loosely into this category, *see Wright v. Southland Corp.,* 187 F.3d 1287, 1303–04 (11th Cir.1999); *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1348–50 (7th Cir.1995).

4. *The First Circuit's Position.* To complete our survey of the legal landscape, we direct our gaze inward. Although we have dropped inconclusive hints here and there, *see, e.g., Ayala–Gerena,* 95 F.3d at 95–96; *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 421 (1st Cir.1996), we have yet to choose among these conflicting ap-

proaches. Thus, the question is wide open in this circuit.

5. *The Case at Hand.* This case does not require us to fill the void, and we decline to do so gratuitously. The appellants contend that two comments attributed to DaCosta—"I don't need minorities, and I don't need residents on this job" and "I don't have to hire you locals or Cape Verdean people"—constitute direct evidence that a proscribed factor influenced Costa Bros.'s hiring practices. The employer demurs, asserting that these are merely "stray remarks" and, in all events, lack sufficient probative force to constitute direct evidence.

We do not share the view that DaCosta's statements must be classified as stray remarks. As we have pointed out, DaCosta was the ultimate decisionmaker, and both pronouncements pertained to the decisional process. He made the first statement when refusing to rehire Rose; because it bore directly on a challenged employment decision, it hardly qualifies as a stray remark. *See, e.g., Deneen*, 132 F.3d at 436; *Diaz–Gandia v. Dapena–Thompson*, 90 F.3d 609, 616 (1st Cir.1996). DaCosta uttered the second statement when cashiering Fernandes and, although this suit does not challenge Fernandes's dismissal per se, *see infra* note 3, we think that the comment, which in terms bears upon Costa Bros.'s repeated refusals to rehire the appellants, sufficiently implicates the decisional process to avoid classification as a stray remark. *See Wichmann v. Board of Trustees*, 180 F.3d 791, 802 (7th Cir.1999), *cert. granted, judgement vacated by,* —— U.S. ——, 120 S.Ct. 929, —— L.Ed.2d —— (1999); *Thomas*, 131 F.3d at 204.

 In the last analysis, however, this taxonomic triumph constitutes a hollow victory for the appellants. Despite the fact that these statements cannot be brushed aside as stray remarks, they are inherently ambiguous and, as such, do not *directly* reflect the alleged animus. The first—"I don't need minorities and I don't

need residents on the job"—may be interpreted either as an admission of an exclusionary hiring practice (thus explicating the true reason for DaCosta's actions) or as a benign response to a specific inquiry reflecting DaCosta's (erroneous) perception that he no longer had to make special efforts to comply with EEO requirements. The second—"I don't have to hire you locals or Cape Verdean people"—may be interpreted either as a discriminatory explanation for DaCosta's actions or as a response to what he perceived as an unjustified attempt to impose some sort of quota system upon his company.

 Under any of the three views we have delineated, these statements do not rise to the level of direct evidence. Courts that take the "classic" position have contrasted direct evidence with, inter alia, ambiguous statements, and have indicated that the latter will not suffice. *See Maldonado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir.1999); *Troupe*, 20 F.3d at 736–37. Courts that take either the "animus plus" or "animus" position place great emphasis on the strength of the proof of discriminatory animus. *See, e.g., Fuller v. Phipps*, 67 F.3d 1137, 1142–43 (4th Cir.1995); *Thomas*, 131 F.3d at 204; *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 122 (2d Cir.1997); *Ostrowski*, 968 F.2d at 182. In our judgment, inherently ambiguous statements, without more, cannot supply the strong evidence that these courts rightfully demand as a prerequisite to mixed-motive analysis. We conclude, therefore, that a statement that plausibly can be interpreted two different ways— one discriminatory and the other benign— does not directly reflect illegal animus and, thus, does not constitute direct evidence. *See, e.g., Carter*, 132 F.3d at 641 ("We have held that statements that are open to more than one interpretation do not constitute direct evidence of racial discrimination."); *Troupe*, 20 F.3d at 736–37 (similar). Thus, DaCosta's statements do not serve to un-

latch the door to the mixed-motive approach.

### C. Pretext Analysis.

█ Having determined that the district court appropriately selected pretext analysis as the method of choice, we next examine the court's execution of that analysis. We again afford plenary review. *See Conward,* 171 F.3d at 18.

**1. The Prima Facie Case.** Notwithstanding Costa Bros.'s tendency to conceptualize this appeal as a reduction-in-force case, the appellants' complaint squarely alleges a discriminatory failure to rehire. Because the appellants have not complained that the layoff itself was discriminatory, the employer's focus on the elements of a prima facie reduction-in-force case is misplaced.[3] The proper focus is on failure to rehire, and the proper source for the elements of a *prima facie failure-to-rehire* case is *McDonnell Douglas* itself.

█ Under that authority, a plaintiff alleging a failure to rehire establishes his prima facie case by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Contrary to Costa Bros.'s contention, a plaintiff need not show as part of his prima facie case that the employer either recalled similarly situated non-minority employees or otherwise treated employees of different ethnic backgrounds more favorably. *See Perry v. Woodward,* 188 F.3d 1220, 1228–29 (10th Cir.1999); *Conward,* 171 F.3d at 19–20; *Walker v. Mortham,* 158 F.3d 1177, 1179 n. 2, 1186 (11th Cir.1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999); *Walker v. St. Anthony's Med. Ctr.,* 881 F.2d 554, 558 (8th Cir.1989); *see also Cumpiano,* 902 F.2d at 155 n. 2.

Against this benchmark, we conclude without serious question that the appellants established a prima facie case. The first prong is uncontroversial; all three appellants are Cape Verdean and, as such, belong to a racial minority. The second element also falls easily into place: all three performed satisfactorily as masons prior to the layoff and plainly were qualified to do the work.[4]

█ Turning to the third facet of the prima facie case, the record establishes that all three appellants returned to the job site at various times after the layoff and sought reinstatement. For the most part, Costa Bros. rebuffed these efforts. The sole exception—the time in March when DaCosta capitulated to external pressure and hired Fernandes as a laborer, only to fire him on his second day of work—hardly suffices to tip the balance. *Cf. International Bhd. of Teamsters v. United States,* 431 U.S. 324, 341–42, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (explaining that subsequent changes in corporate "hiring and promotion policies ... could not erase [the company's] previous illegal

---

3. By the same token, the appellants do not cite Fernandes's firing in March as an independent act of discrimination but, rather, treat it as further evidence of the employer's race-based animus in the December–January time frame.

4. Although DaCosta and Ceribelli state in their respective affidavits that Fernandes "was not a good mason," Costa Bros. does not directly aver that he was unqualified. In all events, Fernandes had worked as a mason for over twelve years; the company retained him until lack of heat forced job-wide layoffs without complaining about his proficiency; and it never cited poor performance as a justification for not recalling him. Given the *de minimis* nature of the proof required to establish a prima facie case, *see Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 38 (1st Cir.1995), and the necessity to draw all inferences in the nonmovant's favor on summary judgment, we readily conclude that Fernandes satisfied this criterion.

conduct or its obligation to afford relief to those who suffered because of it"). This is especially so since what transpired on that occasion plausibly can be interpreted (drawing permissive inferences favorable to the appellants) as further evidence of DaCosta's discriminatory treatment of Fernandes. After all, DaCosta had resisted rehiring Fernandes for several weeks and had to be persuaded to do so by a civil rights advocate. Moreover, Ceribelli—the Costa Bros. foreman—forewarned Fernandes that DaCosta would be "on [his] back," and the sequence of events that followed reasonably could be seen as proof of the pudding.

 The appellants also fulfilled the final prima facie case requirement. In the relevant time frame (December–January), Costa Bros. had an ongoing need for masons on the Mashpee project, hiring and recalling many throughout the period. For aught that appears, the qualifications of the vast majority of these masons were much the same as the appellants' qualifications. No more is exigible. *See Conward,* 171 F.3d at 19.

Costa Bros.'s efforts to dispute this element of the prima facie case are unavailing. In the district court, it characterized its hiring practices as "simply react[ing] to men who appeared at the right place at the right time," and argued that it had no need for additional help at the precise moments that the appellants inquired. On this chiaroscuro record, a jury might so find— but it also might find this to be a self-serving fiction.

It may or may not be a coincidence that, of the nineteen men whom DaCosta furloughed on December 7 and 8 (the three appellants, plus Choquette, George Medeiros, Spinola, William Ceribelli, Juliao Fernandes, Victor Fernandez, Martirio Neto, Antonio Santo, Jose Silva, Artur Teles, Antonio DaSilva, Fernando DaSilva, Miguel Silva, Joseph Pimenthal, Jose Claudino, and Dinos Medeiros), all but five either were reassigned to another Costa Bros. job or recalled in mid-December.[5] Likewise, it may or may not be coincidental that four of the excluded five (the three appellants and Spinola) comprised the entire complement of minority employees who had toiled on the Mashpee project. Moreover, the fourteen men who were given an opportunity to work for Costa Bros. either at Mashpee or on another project in mid-December included two white masons (George Medeiros and William Ceribelli) and three white laborers (Joao Bolarinho, Fernando DaSilva, and Artur Teles) who had been hired, and then furloughed, on approximately the same dates as the appellants.[6]

Costa Bros. attempts to blunt the force of this evidence in three ways. First, it notes that George Medeiros, though recalled, only worked for four days. The fact remains, however, that he was recalled and the appellants were not. Second, Costa Bros. points out that one member of the excluded group (Choquette) was a white mason. That is true as far as it goes—but it does not go very far: the record is devoid of evidence that Choquette applied for reinstatement at any time. Third, Costa Bros. asserts that it rehired Spinola in April 1996. We think that this fact possesses only marginal relevance here, inasmuch as Spinola's recall occurred well beyond the December–January period during

---

5. Because the mason and laborer jobs are closely connected and the record contains some evidence of interchangeability, we conclude that the employer's hiring practices anent both positions during the pertinent period are relevant to our analysis. *See McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817 (holding that evidence relevant to a showing of pretext "includes facts as to … [the em-

ployer's] general policy and practice with respect to minority employment").

6. Costa Bros. argues that Ceribelli, a Brazilian national who was the foreman's son, should be counted as a member of a minority group. The record shows, however, that Costa Bros. itself recorded persons of Brazilian extraction as Caucasians.

which the appellants unsuccessfully sought reinstatement.

In addition to the fourteen rehires just discussed, the record indicates that Costa Bros. engaged a half-dozen new workers for determinate positions during late December and January: Carlos Bolarinho (a laborer, hired on December 29); Piper (a mason, hired on January 2); Winters (a mason, hired on January 10); Joaquim Fernandes (a laborer, hired on January 18); Dan Cormier (a laborer, hired on January 22); and Luis Amaro (a laborer, hired on January 23). All were white. Costa Bros. recruited four more white males (Antonio Reboca, Joao Soares, Michael Oliveira, and Steven Downey) on various dates between January 5 and January 25. Although these four were assigned to work on the Mashpee project, we cannot accurately determine from the existing record which were masons and which were laborers.

These figures make the appellants' point emphatically. They create an ample evidentiary platform for a finding that, during the relevant two-month period, Costa Bros. sought applicants possessing qualifications similar to those of the appellants for open positions. Thus, the prima facie case was fully formed.

**2. The Employer's Reason.** We proceed to the next step of the *McDonnell Douglas* pavane: Costa Bros.'s professed reason for failing to rehire the appellants. In its response to a discovery request, Costa Bros. stated that it hired others in the pertinent time frame because it "needed masons or laborers and the individuals [eventually hired] were available." It also stated that, apart from Piper and Winters, all the masons that it engaged "were currently working or had worked for Costa Brothers." The employer glossed these statements in its summary judgment papers, maintaining that it "simply reacted to men who appeared at the right place at the right time and put them to work."[7]

As to Piper and Winters, Costa Bros. makes situation-specific arguments. Piper, it says, had special skills as a layout man, and Winters was recommended by Victor Fernandez, another Costa Bros. employee.

We assume, for argument's sake, that these reasons, in the aggregate, constitute legitimate, nondiscriminatory grounds for hiring others in lieu of recalling the appellants. Accordingly, we proceed to the third and final stage of the *McDonnell Douglas* inquiry.

**3. Pretext for Discrimination.** Once the employer articulates a legitimate, nondiscriminatory reason for a challenged employment decision, the plaintiff must be accorded a fair chance to show that the stated reason disguised a discriminatory animus. See *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *Pagano v. Frank*, 983 F.2d 343, 348 (1st Cir.1993). As long as the plaintiff offers evidence of pretext, the trial court must not accept the employer's proffered reason for the adverse employment action at face value, no matter how plausible it may sound, but must proceed to the final analytic step. See *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. To that end, we review the summary judgment record.

We start with the employer's situation-specific reasons. The lower court accepted without further inquiry Costa Bros.'s explanations of why it hired Piper and Winters. We are not so sanguine.

That said, we cannot fault the district court's ruling vis-à-vis Piper. Costa Bros. asserts without contradiction that it needed a layout man on the job and that none of the appellants possessed this par-

---

7. Costa Bros. asserts for the first time on appeal that some sort of seniority principle drove its hiring decisions. See Appellee's Brief at 25 n.18. This directly contradicts the argument that it made before the district court. Moreover, the suggestion is largely undeveloped. Consequently, we ignore it. See *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

ticular skill. If true, this rationale suffices to dispel any odor of unfair discrimination, *see Hill v. Seaboard Coast Line R.R. Co.*, 767 F.2d 771, 774 (11th Cir.1985), and the appellants neither contested the need for a layout man nor claimed to possess the requisite skill set.

Winters's hiring is more problematic. The district court characterized this event as cronyism, not discrimination (and therefore lawful, though perhaps unsavory). For this proposition, it relied upon our opinion in *Foster v. Dalton*, 71 F.3d 52 (1st Cir.1995). *Foster*, however, cannot carry the weight that the district court thrust upon it.

■ In *Foster*, the trial court concluded that cronyism, not race discrimination, had prompted a hiring decision. *See id.* at 55. We upheld that conclusion, ruling that "in this case, cronyism provides a sufficient alternative explanation" for the decision. *See id.* at 56. Withal, the district court made its finding not on summary judgment but after a bench trial. *See id.* at 54–56. The opinion does not stand for the proposition that a court, at the summary judgment stage, may accept uncritically an employer's articulation of cronyism as an explanation for its actions. Rather, the court must take the next step and determine, on whole-record review, if the evidence raises a genuine issue of material fact as to whether the proffered explanation is the real reason for the employer's decision or, conversely, a pretext for discrimination. *See, e.g., Conward*, 171 F.3d at 19; *Mullin v. Raytheon Co.*, 164 F.3d 696, 699 (1st Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 44, 145 L.Ed.2d 40 (1999).

At any rate, the district court's error goes well beyond its failure to probe the facts surrounding Winters's enlistment. In the circumstances of this case, the court should have cast the net of its inquiry more widely and assessed all the recalls and hirings that had transpired during the months of December and January. *See*

*McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817; *Conward*, 171 F.3d at 20.

■ Costa Bros. seems to concede that, in the usual case, this would be the proper focus. Nevertheless, it maintains that the appellants directed the lower court's attention to Piper and Winters, and thus have waived the right to claim that the court should have considered a broader array of hiring decisions. We examine this line of defense.

In fairness, the appellants did place heavy emphasis on the arrival of Piper and Winters. Yet, we cannot say that they did so to the exclusion of the broader comparative group. The appellants' complaint alleges, without limitation, that on three dates in January 1996, "the defendant hired other outside white employees for the mason positions previously held by plaintiffs." The appellants followed up on this averment in the course of pretrial discovery; they sought the race and national origin of all employees who were (a) laid off on December 7, 1995, and (b) hired (or rehired) thereafter. When Costa Bros. moved for summary judgment, the appellants' opposition noted that "[d]efendant also admits that numerous employees [who] were white and/or Portuguese were hired at the project as masons," thus conceptualizing the comparative group as comprising more than merely Piper and Winters. They also assailed the employer's contention that DaCosta had hired his "own men," positing that this was not a legitimate, nondiscriminatory reason for failing to recall the appellants because this group included no minorities. Finally, at oral argument on the summary judgment motion, the appellants' counsel attempted to focus the court on the issue of pretext, urging that the "regular crew" and "special skills" explanations "weren't the reasons that [DaCosta] wasn't hiring minorities"; that "when [Rose] went back to this site the place was full ... and none of the faces that he saw on the job site when he returned there were any employees he had seen previously"; and that "the reasons

given [by DaCosta], were false .... the whole place was re-employed and [Piper and Winters] weren't the only [new] people."

■ In sum, the appellants persistently attempted to refer the district court to a larger comparative group. The court, just as persistently, refused to countenance such a comparison. Waivers are not lightly to be inferred, and in these circumstances, we are reluctant to deprive the appellants of their day in court. Although the question is not free from doubt, we conclude that the appellants adequately preserved the argument that the proper comparative group consists of all workers recalled or hired during December and January.

■ We turn to this comparison. Costa Bros. tries valiantly to head off a detailed inquiry by insisting that, in the relevant period, it hired only persons who had been part of its regular complement. Without more, this professed policy cannot justify the entry of summary judgment.[8] Indeed, such a praxis—in DaCosta's phrase, the exclusionary use of "my own men"—cuts both ways. Common sense teaches that when a work force is lily white (or nearly so), practices that have the effect of excluding outsiders may serve to discriminate against minorities in a devastatingly effective manner. Accordingly, the very existence of such a policy sometimes constitutes evidence of discrimination. See, e.g., EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 606 (1st Cir.1995); Thomas v. Washington County Sch. Bd., 915 F.2d 922, 925 (4th Cir.1990). Given the contradictions and ambiguities that permeate this record, the question of whether DaCosta's stated preference for hiring "my own men" is a pretext for racial

discrimination is for the factfinder at trial, not for the judge on a Rule 56 motion.

Costa Bros. also presses a "same actor" argument. See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1st Cir.1993). It observes that Ceribelli hired Rose and Gilbert on the basis of friendship and suggests that declining to rehire them based on racial animus makes no sense. But it was DaCosta, not Ceribelli, who rebuffed Rose and Gilbert when they applied for reinstatement. A jury rationally could conclude, therefore, that, in Ceribelli's own words, he had "only hired a few minorities because of local pressure," and that DaCosta—who owned the company—precluded any further minority hiring once that pressure subsided.

Having cut a passable swath through the tangle of arguments advanced by the employer, we now focus on the adequacy of the appellants' proof of pretext *cum* animus. We previously concluded that DaCosta's statements that (1) "I don't need minorities, and I don't need residents on this job. I got my men," and (2) "I don't have to hire you locals or Cape Verdean people" were amenable to differing interpretations, one benign and one discriminatory. See supra Part III(B). Although this ambiguity defeated the attempt to characterize the statements as direct evidence (and thus defeated the claim that the lower court erred in refusing to engage in a mixed-motive analysis), see id., the question differs under pretext analysis.

■ In that mode, an inquiring court does not ask whether the plaintiff has adduced direct evidence of discrimination, but asks instead whether the evidence presented, regardless of its character, suffices to raise a genuine issue about the

---

8. We say "professed policy" because the employer's assertion stands unconfirmed. The record reveals that it recalled no fewer than three persons who were, by its own admission, not part of its regular crew; and that it hired ten more, including Piper and Winters, who had no prior experience with Costa Bros. Indeed, we are unable to tell with any degree

of assurance which of the other masons and laborers could legitimately lay claim to "regular crew" status. For example, Costa Bros. asserts that Antonio DaSilva and Fernando DaSilva were members of its regular crew, but the record suggests that these two men, like the appellants, were hired for the first time in November 1995.

pretextuality of the employer's explanation for the challenged employment decision. In the course of this latter exercise, the court, at the summary judgment stage, must interpret the evidence in the light most flattering to the nonmovant, resolving all ambiguities in that party's favor. *See Conward,* 171 F.3d at 18; *Pagano,* 983 F.2d at 347. Thus, the fact that DaCosta's comments were susceptible to conflicting interpretations helps the appellants at this juncture.

To all intents and purposes, that ends the matter. The evidence that we recounted in connection with the appellants' prima facie case suffices to put the question of pretext into issue, and DaCosta's statements, taken in the light most favorable to the appellants, add the necessary element of racial animus. *See Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 171 (1st Cir.1998)(citing cases). In other words, there is room on this record for a rational factfinder to infer that Costa Bros.'s failure to recall the appellants was motivated by a proscribed racial animus rather than by random availability of workers or loyalty to members of its regular crew.

If more were needed—and we doubt that it is—the record is replete with other evidence that points to the same conclusion. For instance, Ceribelli, when asked why minority workers had not been recalled, responded that Costa Bros. "had only hired a few minorities because of local pressure." In the same vein, DaCosta's repeated allusions to "you guys" and terms of like tenor reinforce the inference of racial animus. Then, too, the circumstances surrounding Fernandes's abortive return to work lend further support.

We glean another relevant item of proof from George Medeiros's affidavit. Medeiros, a white mason, had been laid off along with the appellants on December 7. Later that month, he inquired about reinstatement. According to Medeiros:

> Mr. Ceribelli told me to call Domingos DaCosta at the company office, and inform him that I am looking for work as

a bricklayer and mason, and specifically inform him that I am a Mashpee resident *and am white.* I did what Mr. Ceribelli asked me to, and the next day [December 15] was hired to work on the Mashpee High School Project.

(Emphasis supplied.)

Although the appellants do not choose to catalog this statement as direct evidence of racial discrimination—a choice on which we take no view—we believe that it speaks volumes in a pretext analysis. We realize that a factfinder will have to pass upon Medeiros's credibility, but that is precisely the point. The evidence, taken as a whole, creates a genuine issue of material fact as to whether Costa Bros.'s explanations are canards, designed to mask a discriminatory animus.

### D. *The State–Law Claim.*

We need not separately discuss the merits of the appellants' state-law claim. The *McDonnell Douglas* framework applies to disparate treatment claims brought under Chapter 151B, but the appellants' burden is somewhat lighter in one respect. "While federal law requires a showing of pretext plus [racial] animus, the Massachusetts courts appear, at the third step of the pavane, to require a claimant to show only pretext." *Mullin,* 164 F.3d at 699 (citing *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 646 N.E.2d 111, 116–17 (1995)). We already have concluded that genuine issues of material fact exist as to whether Costa Bros.'s stated reasons for its actions are a pretext for discrimination. *See supra* Part III(C). *A fortiori,* we must reach the same conclusion with respect to the appellants' state-law claim. *See Brennan v. GTE Gov't Sys. Corp.,* 150 F.3d 21, 26–27 (1st Cir.1998).

### IV. CONCLUSION

We need go no further. In the circumstances of this case, sufficient evidence exists to permit a rational finder of fact to

infer that the employer's articulated reasons for not rehiring the appellants are merely a coverup for racial discrimination. Consequently, we vacate the order granting summary judgment and remand for further proceedings consistent herewith.[9]

*Vacated and remanded.* Costs to appellants.

---

9. In an abundance of caution, we note that although the appellants' present proffer falls shy of the direct evidence threshold, it is possible that they might adduce further evidence at trial that would warrant the district court in concluding that mixed-motive analysis is appropriate and in framing its jury instructions accordingly. *See Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1098 (3d Cir.1995); *Ostrowski*, 968 F.2d at 181. Although we take no view of the likelihood of this possibility materializing, our decision today does not foreclose it.