Rand v. New Hampton School          CV-99-134-JD   04/24/00
                UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


Patricia Rand

     v.                                 Civil No. 99-134-JD
                                        Opinion No. 2000 DNH 100
New Hampton School


                          O R D E R


     The plaintiff, Patricia Rand, was an employee of the

defendant, New Hampton School (the "School").  After the School

declined to renew Rand's employment contract, Rand sued the

School under the Age Discrimination in Employment Act (ADEA), 29

U.S.C.A. §§ 621-634 (1999), and New Hampshire common law.  The

School moves for partial summary judgment on Rand's ADEA claim

only (Count I of the complaint), and Rand objects.


                         Background

     The School is a private boarding and day college preparatory

school located in New Hampton, New Hampshire.  Jeffrey Beedy has

been Headmaster of the School since 1992.  Beedy has the ultimate

authority for hiring, promoting, and discharging employees.

Beedy hired Rand in 1993 as a secretary in the Admissions

department.  At the time she was hired, Rand was fifty-three

years old.

Rand was hired on a yearly contract basis. She was promoted several times, and in 1995, she was promoted to hold both the positions of Director of Admissions and Director of Financial Aid. Beedy gave Rand's work high praise, and on one occasion, he expressed his happiness that she would remain at the School for many years.

In early May of 1997, Rand was informed by two School administrators, Alan Crocker and Jill Duncan, that Beedy wanted to hire another person to work in Admissions. Rand was initially told that the new employee would provide her with additional support. Instead, Beedy had decided to hire a new person to lead the Admissions office, but Rand was not told this. The School contends that Beedy wanted to hire someone who would lead the Admissions department and the School "to the next level," while still utilizing Rand's skills and experience. Beedy felt that Rand was not able to take the School "to the next level." In particular, Beedy wanted a leader in Admissions who could diversify the School's student body and take better advantage of technology and automation. Rand claims that the School improperly assumed she could not keep up with technological developments because of her age.

Later in May of 1997, Rand met with Beedy and Crocker and was told that the new employee would be designated Head of

3

Admissions. She was informed that she would retain the title of Director of Admissions, and her salary and office would not change. In June of 1997, the School hired Andrew Churchill, age 27, to be the Head of Admissions. Churchill had four years of experience in school admissions and two years of experience with financial aid. Despite the difference in their ages, Rand and Churchill had similar amounts of relevant work experience.

On July 25, 1997, Rand's employment contract was renewed effective July 1, 1997, through June 30, 1998. The contract retained her job title of Director of Admissions, and Rand received a salary increase. However, Churchill's job duties put him in charge of Admissions, and Rand was functionally his subordinate. Churchill was unaware that Rand was supposed to retain the title of Director of Admissions, and Beedy represented in a report to the School's Board of Trustees that Rand had a new role as a senior admissions associate.

The working relationship between Rand and Churchill quickly chilled. The parties dispute the source of the conflict. Rand claims it stemmed from Churchill's discomfort with her age, experience, and long-standing success at the School. At any rate, it is undisputed that Churchill and Rand had difficulty working together. In January of 1998, Churchill wrote a negative performance evaluation of Rand. None of Rand's previous

4

evaluations had been negative.

Churchill and Rand both discussed their problems working together with Beedy. In April of 1998, Beedy decided not to renew Rand's employment contract, and Churchill informed Rand of this decision. At that time, Rand was age 57. Shortly thereafter, Crocker told Rand the School wanted to give her a retirement party as well as a rocking chair or some other parting gift. Rand indicated she did not want any of these things because she was not retiring. The School later sent her a rocking chair.

Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The record evidence is taken in the light most favorable to the nonmoving party, indulging all reasonable inferences in her

5

favor.  See Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 577 (1st Cir. 1999).  An issue of fact is genuine if there is sufficient evidence to permit a rational fact-finder, considering the evidence in the light most favorable to the nonmoving party, to find for either party.  See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

In response to a properly supported motion for summary judgment, the nonmoving party bears the burden to show a genuine issue for trial by presenting significant material evidence in support of the claim.  See Tardie v. Rehabilitation Hosp., 168 F.3d 538, 541 (1st Cir. 1999).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz, 896 F.2d at 8 (internal quotations and citations omitted).  Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Discussion

Rand claims that the School's decision not to renew her contract was unlawfully motivated by age discrimination. The School contends that it is entitled to summary judgment because Rand has failed to present direct evidence of age discrimination, has not successfully made out a prima facie case of age discrimination, and cannot prove that the School's alleged legitimate reasons for its actions are pretext or that the School was motivated by discriminatory animus. Rand challenges all of these arguments.

I.   Burden of Proof

The parties dispute which legal framework should govern the court's analysis. There are two such frameworks available to the court in a disparate treatment case such as this one, the mixed-motive analysis and the pretext analysis. See Fernandes, 199 F.3d at 579-81.[1] Where direct evidence shows that an employer was substantially motivated by discriminatory animus in making a challenged employment decision, the court employs the mixed-motive analysis set forth in Price Waterhouse v. Hopkins, 490

_____

[1]The court cites to Title VII and ADEA cases without distinction because the same burden-shifting frameworks apply in both types of cases. See Smith v. F.W. Morse & Co., 76 F.3d 413, 421 n.4 (1st Cir. 1996).

7

U.S. 228 (1989). See Fernandes, 199 F.3d at 580; Smith, 76 F.3d at 421. In all other cases, the court uses the familiar pretext analysis from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Fernandes, 199 F.3d at 580. Therefore, the court first considers whether Rand has presented sufficient direct evidence to warrant use of the mixed-motive analysis.[2]

Determining what qualifies as direct evidence can be difficult. See, e.g., Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 429 (1st Cir. 2000) (reserving judgment on direct evidence issue and using McDonnell Douglas standard). The First Circuit has not settled on a standard for addressing this question. See Fernandes, 199 F.3d at 582-83 (discussing other circuits' positions but declining to decide). However, the court is guided by some benchmarks. For example, "stray remarks" made in the workplace by employees who lack the authority to make

---

[2]Rand cites Cardona Jimenez v. Bancomerico de Puerto Rico, 174 F.3d 36 (1st Cir. 1999), for the proposition that when a plaintiff has direct evidence of discriminatory animus, the case should proceed directly to the jury. See id. at 40. While this rule might apply "in cases concerning the legitimacy of employment practices acknowledged to be the basis for the adverse employment decision," in most cases, including the present one, the employer offers another legitimate reason for the adverse employment decision, thereby requiring a mixed-motive analysis. Griffiths v. Cigna Corp., 988 F.2d 457, 470 n.12 (3d Cir. 1993), overruled on other grounds, Miller v. Cigna Corp., 47 F.3d 586 (3d Cir. 1995).

employment decisions, or remarks made outside the context of an employment decision, do not constitute direct evidence of animus. See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996); see also Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998). Direct evidence must be more closely linked to the adverse employment decision. See Shorette, 155 F.3d at 13-14; Ayala-Gerena, 95 F.3d at 96-97. Furthermore, "a statement that plausibly can be interpreted two different ways — one discriminatory and the other benign — does not directly reflect illegal animus and, thus, does not constitute direct evidence." Fernandes, 199 F.3d at 583.

Rand presents the following as direct evidence of the School's discriminatory animus. First, she argues that Crocker and Duncan both admitted that Churchill's problems with Rand stemmed from his insecurities about age.[3] Assuming, for now,

---

[3]The parties point to the following deposition excerpts:
Q. Do you believe that Mr. Churchill felt threatened at all by Ms. Rand's age and experience?
A. I believe he felt insecure by the situation.
Q. What do you mean by that?
A. He's young and I believe he came in wanting to make a good impression and wanting to be well-liked and that the more he did, the less successful he was and the less people liked him and the more insecure he got.
Q. Do you believe the fact that he was young and Ms. Rand was older played a part in any of this insecurity?
A. I don't think that it had so much to do with either one

9

that Churchill was involved in the School's decision not to renew Rand's contract, the evidence Rand submits to support Churchill's alleged insecurities is inconclusive and does not directly show illegal motivation connected with the decision to terminate Rand.

Rand also argues that Crocker's offers to her of a retirement party and a rocking chair are direct evidence of discriminatory animus. These gestures are ambiguous, as they can be interpreted plausibly to represent the School's good wishes

---

> of their ages as it did the relationships. Pat had great relationships built within the school and with the external community with parents, with kids, with consultants and I think that's what he was insecure about.
>
> ...
>
> Q. Do you believe age played some role in his feeling of insecurity in coming to New Hampton School?
>
> A. No.
>
> Q. Do you feel that he felt threatened at all by Ms. Rand's age?
>
> A. Not by her age.
>
> Duncan Dep. at 68-70.

> A. Mr. Crocker explained to me why he felt [Churchill] was intimidated by me. When I went to Alan [Crocker] at one point for some guidance, some support and was told that, yeah, he was intimidated by me, but anyone would be at his age who's coming in and was asked to run a department where the previous director who was older and had success, had several successful years, he would be intimidated.
>
> Rand Dep. at 80.

and appreciation for Rand's contributions.  Without more, Rand does not present direct evidence that the School discriminated against her.  Therefore, the court applies the McDonnell Douglas pretext analysis.

II.  Application of McDonnell Douglas standard

Under this analysis, the plaintiff must first establish a prima facie case.  See Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000).  "Establishment of a prima facie case creates a presumption of unlawful discrimination." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999).  To rebut this presumption, the employer has the burden of articulating a legitimate, nondiscriminatory reason for taking the challenged employment action.  See Cruz-Ramos, 202 F.3d at 384; Rodriguez-Cuervos, 181 F.3d at 19.  "If the employer meets its burden, the presumption of discrimination vanishes." Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1st Cir. 1998). Then, the plaintiff must "show both that the employer's 'proffered reason is a sham, and that discriminatory animus sparked [its] actions.'"  See Cruz-Ramos, 202 F.3d at 384 (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999)).  At the summary judgment stage, the defendant could prevail only if the plaintiff "failed to adduce sufficient

11

evidence from which a rational factfinder could return a verdict in [her] favor, without resorting to conclusory allegations, improbable inferences, and unsupported speculation." Shorette, 155 F.3d at 12 (internal citations and quotations omitted).

A.   Prima Facie Case

The School contests Rand's showing on one element of the prima facie case only, that the School replaced Rand with a "person with roughly equivalent job qualifications."[4] Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 332 (1st Cir. 1997) (citing Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113 (1st Cir. 1993)). "[I]n a nonreduction in force scenario, it is enough for the plaintiff to show that the employer sought some form of replacement performance, which would demonstrate its continued need for the same services and skills." Hidalgo, 120 F.3d at 332-33 (internal quotations omitted). A replacement does not have to be formally designated a replacement. See id. at 333 (citing Loeb v. Textron, Inc., 600 F.2d 1003, 1013 (1st Cir. 1979)). A plaintiff can meet her burden on this element, at

---

[4]This version of this prima facie element applies in nonreduction in force cases. The parties have not argued, and the record does not indicate, that this case involves a reduction in force. Therefore, the court assumes that this a nonreduction in force case.

least in a nonreduction in force case, by showing that her job duties were absorbed by the defendant's employees after her employment was terminated.  See Hidalgo, 120 F.3d at 334 (citing Kale v. Combined Ins. Co. of Am., 861 F.2d 746, 760 (1st Cir. 1988)).[5]  The School admits that Rand's duties were absorbed by existing employees after her departure.  Therefore, Rand has met her burden of presenting a prima facie case of age discrimination.  See id. at 334 (citations omitted) (prima facie burden is not onerous).

B.    Pretext / Discriminatory Animus

The School has articulated a legitimate, non-discriminatory reason for declining to renew Rand's contract — namely, that her working relationship with her supervisor, Churchill, deteriorated due to a personality conflict.  To survive summary judgment, Rand must raise a genuine issue of fact that she received disparate treatment on the basis of age.  See Dominguez-Cruz, 202 F.3d at 430-31; Thomas v. Eastman Kodak Co., 183 F.3d 38, 58 (1st Cir.

---

[5]The School cites Cruz-Ramos to argue that no "replacement" occurs when existing employees absorb the duties of a discharged employee.  However, Cruz-Ramos and the case it cites are both reduction in force cases, which operate under a slightly different prima facie case.  See Cruz-Ramos, 202 F.3d at 384; LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842, 846 (1st Cir. 1993).

13

1999), <u>cert. denied</u>, 120 S. Ct. 1174 (2000).

The First Circuit has long held that to avoid summary judgment at the third stage of the <u>McDonnell Douglas</u> analysis, the plaintiff "must adduce minimally sufficient evidence of pretext and discriminatory animus." <u>Goldman</u>, 985 F.2d at 1117; <u>see also</u> <u>Dominguez-Cruz</u>, 202 F.3d at 430. The First Circuit has also held that the plaintiff does not necessarily have to provide separate proof of pretext and discriminatory animus. <u>See</u> <u>Thomas</u>, 183 F.3d at 57-58, 62. The same evidence may be used to prove both, "provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." <u>Id.</u> at 57 (quoting <u>Rodriguez-Cuervos</u>, 181 F.3d at 22 n.5). "[T]he focus should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by age discrimination." <u>Dominguez-Cruz</u>, 202 F.3d at 431 (internal quotations omitted).

Rand does not dispute that she and Churchill had a personality conflict, or that the School fired her because of this conflict. Instead, she argues that the personality conflict

14

itself was tainted by Churchill's discriminatory animus, and therefore the School cannot rely on the personality conflict as a legitimate reason for not renewing her contract.

Rand's argument is similar to the plaintiff's argument in Thomas. See Thomas, 183 F.3d at 58. In that case, the plaintiff's supervisor allegedly discriminated on the basis of race by giving the plaintiff negative work evaluations. The employer then fired the plaintiff based on those evaluations. The employer's discrimination lay not in the decision to fire, but in the supervisor's actions that led to the decision to fire. See id. Rand and Churchill, her supervisor, had a personality conflict that led to Rand's firing. If the personality conflict grew out of Churchill's discriminatory animus, then the School's reliance on that conflict makes the firing discriminatory.

Furthermore, the First Circuit stated in Thomas that an employer does not have to discriminate consciously; it is enough if it does so "because of unthinking stereotypes or bias." Id. (citations omitted). Therefore, if the supervisor in Thomas issued performance evaluations that were tainted by discriminatory stereotype or bias, then her actions were discriminatory, even if she was unaware of the illegal influence on her actions. See id. Similarly, if Churchill unknowingly wrote his negative performance evaluation of Rand based in part

15

on his bias or stereotypes about older people, or if he unwittingly worsened their working relationship by exercising negative stereotypes based on age, and these actions led to Rand's firing, then the firing was discriminatory.[6]

Accordingly, it is relevant whether the personality conflict between Rand and Churchill was caused by Churchill's stereotypes or biases concerning older people, as Rand claims. To support her claim, Rand points to evidence that Churchill acted unprofessionally towards her, showing disregard for her abilities.[7] This inappropriate behavior could suggest to a

_____

[6]Furthermore, the record presents a factual question concerning the level of Churchill's involvement in the decision not to renew Rand's contract. While it is undisputed that Beedy had final authority to make such decisions, the record shows that Churchill may have personally influenced Beedy's decision to fire Rand. See, e.g., Crocker Dep. at 89 ("The decision when [Rand] wasn't going to be renewed, which was Jeff [Beedy] and Andy's [Churchill's], was really that they weren't working together.").

[7]Rand points to the following excerpt from her own deposition to demonstrate Churchill's unprofessional behavior:
Q.  How would [Churchill] react when you showed that you had a relationship or rapport with consultants?
A.  He chose not to allow me to go to conferences.
...
Q.  How would [Churchill] react when you showed you had a relationship or rapport with families that indicated to you that he was threatened?
A.  He would get angry and then it would come out in his behavior towards me.
Rand. Dep. at 105.

16

factfinder that Churchill did not respond neutrally to Rand. <u>See</u> <u>id.</u> at 64. Rand claims that Crocker and Duncan acknowledged Churchill's age-based insecurities, as discussed above in the context of direct evidence. While this evidence is not strong enough to constitute direct evidence of discriminatory animus on Churchill's part, it is probative of the role age played in Churchill's perceptions of, and behavior towards, Rand.

Rand also points to Churchill's negative evaluation of her work performance, in contrast to previous positive evaluations. Supervisors who unwittingly fall victim to stereotyping may give employees unduly harsh performance evaluations, especially in environments where there is only one employee who fits into a particular stereotyped category. <u>See</u> <u>Thomas</u>, 183 F.3d at 61. On the other hand, when an employee's evaluations decline under a new supervisor, it could simply indicate that the new supervisor operates by higher standards. <u>See</u> <u>id.</u> at 62; <u>Rodriguez-Cuervos</u>, 181 F.3d at 20. Rand does not point to evidence indicating that Churchill treated her differently from younger employees or evaluated her performance more strictly than he did others. <u>See,</u> <u>e.g.</u>, <u>Thomas</u>, 183 F.3d at 62 (comparing supervisor's grades of plaintiff's performance with grades of other employees). However, the record does show that Beedy highly praised Rand's performance in the years prior to Churchill's arrival at the

School, and that Rand was considered a strong asset to the School by administrators, as well as parents and consultants that she dealt with on the job.[8]

Taking the facts before the court in the light most favorable to Rand, it is conceivable that a factfinder could find that the personality conflict between Rand and Churchill was caused substantially by Churchill's discriminatory conduct and animus towards Rand. Therefore, Rand has raised a genuine issue of fact concerning the legitimacy of the School's reason for discharging her. Furthermore, Rand has raised a genuine issue of fact that the School's decision to terminate Rand was predicated

---

[8]The School argues that because the same person (Beedy) both hired and fired Rand, the court should strongly infer that the School did not discriminate by firing Rand. See LeBlanc, 6 F.3d at 847 (citations omitted). However, approximately five years passed between the commencement and termination of Rand's employment. The School's administrators could well have changed their perception of Rand based on age during that time. More importantly, Churchill was not involved in Rand's hiring, and there is evidence to indicate he may have been involved in the decision to terminate her, even if he did not have the ultimate authority to do so. Under these facts, it is inappropriate to place strong emphasis on Beedy's role in both hiring and firing Rand. Similarly, while the fact that Rand was already age 53 when she was hired is probative, the School has not cited First Circuit case law to support a strong inference against discrimination in firing just because Rand was a member of the protected class when she was hired.

18

on a personality conflict caused by age-based animus by Rand's supervisor.  Therefore, Rand has raised sufficient issues to defeat summary judgment.

## Conclusion

For the foregoing reasons, the defendant's motion for partial summary judgment (document no. 13) is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

April 24, 2000

cc:  Lauren S. Irwin, Esquire
     Jennifer Shea Moeckell, Esquire