Debbie SHERMAN, Plaintiff,

v.

AI/FOCS, INC, Defendant.

No. 97–11491–JLT.

United States District Court,
D. Massachusetts.

May 24, 2000.

Edward M. Cronin, Jr., Cambridge, MA, for Debbie Sherman, plaintiff.

David B. Wilson, Robinson & Cole, Jeffrey L. Hirsch, Robinson & Cole, Boston, MA, for AI/FOCS, Inc., defendant.

## MEMORANDUM

TAURO, District Judge.

Plaintiff Debbie Sherman brings this action against her former employer, Defendant AI/FOCS, Inc., for violations of the Family and Medical Leave Act ("FMLA" or "the Act"), 29 U.S.C. § 2601 et seq., and the Consolidated Omnibus Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 et seq. Plaintiff alleges that she was impermissibly laid off from her position at AI/FOCS upon return from FMLA protected maternity leave. She alleges further that, after her termination, Defendant failed to give proper notice of her right to continued insurance coverage under COBRA.

The court conducted a bench trial and makes the following findings of fact and conclusions of law.

## I. BACKGROUND

Plaintiff began her employment for Defendant in September of 1992, working as an accounts payable specialist and eventually moving up to the position of junior,

and then senior, accountant.[1] *See* April 27, 1999 Hr'g Tr. at 11–12, 14. During Plaintiff's tenure at AI/FOCS she received favorable reviews, promotions, and salary increases, and was never disciplined or suspended for any reason. *See id.* at 13–15. In addition, Plaintiff received special recognition in the spring of 1996 for exposing embezzlement by her direct supervisor, Comptroller Neal Dwyer. *See id.* at 20–21; Ex. 9.

Plaintiff first informed Defendant that she was pregnant in February 1996. *See* April 27, 1999 Hr'g Tr. at 16. Plaintiff's son was born on June 21, 1996, and her maternity leave was scheduled to run from June 24, 1996 through September 16, 1996. *See id.* at 16–17.

The hiring of Mr. Dwyer's replacement as Comptroller, Meredith Nunes, coincided roughly with the commencement of Plaintiff's maternity leave. Ms. Nunes "first day" of work was June 13, 1996. She immediately took a two week vacation,[2] *see id.* at 103, and returned on the day Plaintiff's maternity leave began, June 24, 1996. *See id.* at 17, 103.

During Plaintiff's maternity leave, she received regular phone calls from Comptroller Nunes, as well as other AI/FOCS employees, inquiring about various accounting and payroll problems at work.[3] *See id.* at 25–28, 30–36. These phone calls began while Plaintiff was hospitalized following the delivery of her son. *See id.* at 36. Once she returned home, Plaintiff spoke to Ms. Nunes on two occasions. During the first telephone call, Ms. Nunes "chewed [Plaintiff] out" regarding training procedures in the accounting department. *Id.* at 27–28. During the second conversa-

tion she asked Plaintiff to come in to work to resolve accounting difficulties. *See id.* at 30–31. In response to Ms. Nunes's request, Plaintiff went to work for three to four hours one day in late July or early August 1996, assisting accounting consultants in deciphering payroll schedules and other accounting worksheets. *See id.* at 31–32. Thereafter, Ms. Nunes made frequent phone calls to Plaintiff, as often as once a day during a two week period in August. *See id.* at 36. Plaintiff did not return those calls, which were left on her answering machine. Ms. Nunes eventually ceased calling in mid-August. *See id.* In addition, Ms. Nunes frequently asked Paul Mahoney, Plaintiff's common law husband, to telephone Plaintiff, or to deliver messages requesting Plaintiff to call her at work. *See id.* at 36, 98.

Plaintiff had planned to return to work in early September. On September 3, 1996, she visited her physician to obtain medical clearance. Two days later she contacted Dawn Butler, Defendant's Human Resources Manager, to discuss health insurance plans. *See id.* at 39. Ms. Butler suggested that Plaintiff come to the office on September 6 to review insurance options. *See id.* Plaintiff arrived at AI/FOCS on September 6 and met with both Ms. Butler and, to her surprise, Ms. Nunes as well. *See id.* at 39–42. At that meeting, Ms. Butler and Ms. Nunes notified Plaintiff of her termination by lay-off, and provided her a termination letter dated the previous day. *See id* at 41–42; Ex. 21. Ms. Butler also offered Plaintiff a severance agreement containing a release of all potential claims, *see* Ex. 23, which Plaintiff

---

1. Plaintiff was an "at-will" employee, having no employment contract or promise of future employment. *See* Tr. April 27, 1999 at 68–69.

2. Ms. Nunes worked for one day and then left for a two week vacation which she had arranged and paid for before she accepted the position with Defendant. *See id.* at 103. Ms. Nunes came in prior to her vacation at the request of President Paul Burningham. *See id.*

3. Plaintiff testified that, of the calls received during her leave, only those from Ms. Nunes were purely work related, while calls from other employees, such as Charlene Ebbeling, involved mostly personal matters (inquiries about the baby) and some work related questions. *See id.* at 25–27, 73.

refused to sign. Included therein was notification of Plaintiff's rights to extend her insurance coverage under COBRA. *See id.;* April 27, 1999 Hr'g Tr. at 44.

Following her termination Plaintiff was contacted twice by Defendant with offers of employment. The first, in early November of 1996, involved an offer for part-time employment (24 hours a week) in an accounting position. *See* April 27, 1999 Hr'g Tr. at 48; Ex. 31. The position paid $12 per hour and provided no employee benefits. *See* April 27, 1999 Hr'g Tr. at 49. About two weeks later, Defendant offered Plaintiff a second position that combined the part time accounting position with that of receptionist. *See id.* at 51–53; Ex. 32. The second position also paid $12 per hour, but was full time (40 hours per week) and included benefits. *See* April 27, 1999 Hr'g Tr. at 51–53, 85; Ex. 32. Both of the offered positions paid less than the $564 per week that Plaintiff received prior to her termination. Plaintiff did not accept either offer. Plaintiff attempted to find other employment following her termination, obtaining part-time work from August 1997, until starting her most recent, full time job with the Town of Natick in December 1998. *See* April 27, 1999 Hr'g Tr. at 66–67.

Defendant sent Plaintiff a letter in early October of 1996 identifying her right to extend health insurance coverage under COBRA. *See id.* at 56–57; Ex. 27. Plaintiff submitted the enrollment form to Defendant on October 29, 1996, but subsequently received notice from her health insurance provider that she did not have coverage. *See* April 27, 1999 Hr'g Tr. at 59. Plaintiff contacted Dawn Butler, who informed her that she had not received the enrollment form. Plaintiff provided an additional enrollment form on December 3, 1996. *See id.;* Ex. 34. Subsequently, Defendant reinstated Plaintiff's coverage and submitted a bill to her for approximately $1500 to cover the COBRA insurance premiums for October through December 1996. *See* April 2, 1999 Hr'g Tr. at 60. At that time, Plaintiff could only afford to pay for two months of insurance premiums. *See id.* Plaintiff's coverage was then terminated. In May 1997, Plaintiff incurred $11,100 in medical bills as a result of an appendicitis, which she was unable to pay due to her lack of insurance coverage. *See id.* at 63–64.

## II. DISCUSSION

### A. The FMLA Claim

The purpose of the Family and Medical Leave Act is to "balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b)(1). In furtherance of these goals, the Act provides up to twelve weeks of unpaid leave during any 12 month period for various family and medical contingencies, including "the birth of a son or daughter of the employee." *Id.* § 2612(1)(A). Where an eligible employee takes such leave, the employer must restore the employee to the position held before the leave commenced or "to an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment." *Id.* § 2624(1).

In addition to creating these entitlements, the Act also precludes employers from discriminating against employees that exercise their rights under the FMLA.[4] *See Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159–60 (1st Cir. 1998) (citing 29 U.S.C. § 2615(a)(1), (2); 29 C.F.R § 825.220 (1997)). The Act therefore prohibits employers from considering "the taking of FMLA leave as a negative

---

4. In *Hodgens* the First Circuit breaks down the FMLA into substantive rights (entitlement to leave) and proscriptive violations (prohibitions on discriminating against those that take leave). *Id.,* 144 F.3d at 159–60. It then analyzed the plaintiff's claim as a violation of a proscribed retaliation. The court here follows this approach, finding that Plaintiff was retaliated against for taking FMLA leave.

factor in employment actions such as hiring, promotions or disciplinary actions...." 29 C.F.R. § 825.220(c) (1998). An employer who violates FMLA is subject to liability for compensatory damages, interest, and liquidated damages. 29 U.S.C. § 2617(A).

Where an employee brings a claim of discrimination under the FMLA, the First Circuit appears to take a two pronged approach. In *Hodgens*, the court held that "when there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to claims that an employee was discriminated against for availing [herself] of FMLA protected rights." *Hodgens*, 144 F.3d at 160 (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The *McDonnell Douglas* framework was adopted for resolving the "tricky issue" of the employer's motivation in discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e17. *See Hodgens*, 144 F.3d at 160. It utilizes a three step burden shifting approach to determine whether an adverse employment decision was motivated by discriminatory animus. *See id.*

■ By stating that *McDonnell Douglas* applies where "there is no direct evidence of discrimination," the court implies that a different approach is warranted where direct evidence of discrimination exists. While the First Circuit has not identified what that approach is in the FMLA context, its decision in *Hodgens* demonstrates that it is appropriate to look to Title VII claims to see how courts address direct evidence of discrimination. The approach used in such scenarios is the "mixed-motive" test of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[5] Under the mixed motive analysis,

> once the plaintiff proves that a proscribed factor "played a motivating part" in the decision, the burden of persuasion shifts to the employer, who will be liable for damages under Title VII unless "it can be proven that, even if it had not taken the [proscribed factor] into account, it would have come to the same decision regarding [the plaintiff]."

*Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572, 580 (1st Cir.1999) (alteration in original) (quoting *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. 1775).

The difference between these two tests is significant. Under the mixed motive analysis, once the employee establishes a discriminatory motive, the burden of persuasion shifts to the employer, who then must affirmatively prove that it would have made the same decision, notwithstanding the improper motive. *See Fernandes*, 199 F.3d at 581 (citing *Ayala–Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 95–96 (1st Cir.1996); *Price Waterhouse*, 490 U.S. at 246, 109 S.Ct. 1775). "This contrasts vividly with pretext analysis, under which the employee retains the burden of persuasion throughout."[6] *Id.* (citing *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 153 (1st Cir.1990)).

Because the First Circuit has not addressed whether the *Price Waterhouse* analysis is appropriate in the FMLA context, and because the tests impose different burdens, this court examines Plaintiff's claim under both the mixed motive and pretext frameworks.[7] In doing so, the

---

**5.** While the *Price Waterhouse* rule was partially overruled by Congressional enactment in 1991, those changes have not altered its application to mixed-motive retaliation cases in the First Circuit. *See Tanca v. Nordberg*, 98 F.3d 680, 684 (1st Cir.1996).

**6.** Under pretext analysis, once the employee establishes a prima facie case, a burden of production shifts to the employer to show a nondiscriminatory basis for the decision.

*Cumpiano*, 902 F.2d at 153. If the employer does so, the employee has the burden of persuading the court that the employers basis was a pretext. *See id.* The employee thus always retains the burden of persuasion.

**7.** This approach follows that taken recently in a Title VII case decided by the First Circuit. There, the court utilized this two prong analysis; first examining the claim under the mixed motive, *Price Waterhouse* test, then ap-

court concludes that Defendant violated the Act under either standard.

### 1. Applying the *Price Waterhouse,* Mixed–Motives Standard

In a recent case applying *Price Waterhouse* in the Title VII context, the First Circuit concluded that the mixed-motive analysis is only applied "to those infrequent cases in which a plaintiff can demonstrate with a high degree of assurance that the employment decision of which [she] complains 'was the product of a mixture of legitimate and illegitimate motives.'" *Fernandes,* 199 F.3d at 580 (quoting *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. 1775). The court concluded that the mixed-motive test thus requires " 'direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their conclusion.'" *Id.* (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)).

### a. The Discriminatory Motive.

■ The relevant inquiry, then, is whether Plaintiff introduced direct evidence of a discriminatory motive. In addressing this issue in *Fernandes,* the First Circuit declined to adopt any of the various approaches to defining "direct evidence." [8] *Id.* 199 F.3d at 582–83. Here, however, Plaintiff has certainly adduced sufficient evidence to prove discriminatory motive, regardless of the standard applied. Indeed, the testimony of Plaintiff's direct supervisor, Meredith Nunes, who made the ultimate decision to terminate Plaintiff, convincingly established a discriminatory motive.[9]

Ms. Nunes testified that Plaintiff was "uncooperative and not responsive" while on maternity leave, and that this attitude played a role in her decision to lay off Plaintiff. *See* April 27, 1998 Hr'g Tr. at 149. This court finds that Ms. Nunes's assessment of Plaintiff's attitude was based on Plaintiff's ultimate refusal to respond while on maternity leave [10] both to Nunes's several business phone calls and to her requests sent through Paul Mahoney to call work. Ms. Nunes testimony indicates that she believed that an employee on maternity leave was obliged to accept and return work related telephone calls and, if needed, the employee was obliged to come into work. *See id.* at 148, 178. Further, Ms. Nunes's testimony demonstrates that she viewed Plaintiff's failure to meet all of these "obligations" as an acceptable factor to consider in deciding to terminate Plaintiff. The FMLA does not permit this calculus.

The ability to take FMLA leave is not conditioned upon the willingness of an employee to remain "on call" to the employer. Of the many prerequisites to FMLA leave, the convenience of the employer is not one. "An employer is prohibited from interfering with, restraining, or denying the exercise of (or attempt to exercise) any rights provided by the Act." 29 C.F.R. § 825.220(a)(1) (1998). Further, "[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c) (1998). By essentially

---

plying the pretext test of *McDonnell Douglas.* *See Fernandes,* 199 F.3d at 581–89.

**8.** These are the "classic" definition, the "animus" definition, and the "animus plus" definition. *See Fernandes,* 199 F.3d at 582.

**9.** For instance, the most demanding standard, the "classic" approach, defines direct evidence as that which, if believed, proves discriminatory animus without reliance on inference presumption or other evidence. *Fernandes,* 199 F.3d at 582. Ms. Nunes's

clear expression of a discriminatory motive satisfies this definition.

**10.** Nunes found this attitude unreasonable, despite the fact that Plaintiff was initially responsive to her work related inquiries over the telephone and that Plaintiff went into the office at Nunes's request to help resolve accounting difficulties, baby in hand, only four weeks after a difficult birth (three days of labor followed by a cesarian section). *See id.* at 22, 25.

requiring Plaintiff to work while on leave, and by terminating her for failing to do so, Defendant has "interfered" with Plaintiff's attempts to take leave, and "discriminated" against her for taking it. Because she acknowledged her impermissible attitude and conduct during her testimony at trial, Ms. Nunes has provided direct evidence of discrimination.

Once Plaintiff demonstrated a discriminatory motive, the burden then shifted to Defendant to show that it would have discharged Plaintiff despite the improper motive.

b. Defendant's Non-discriminatory Explanation

Defendant attempts to meet the burden of showing an independent, nondiscriminatory basis with evidence that Plaintiff's discharge was a cost-cutting business decision, and that Plaintiff was terminated in favor of a more qualified and senior employee.

i. Defendant's decision to eliminate a position.

Defendant presented convincing evidence that it had a legitimate basis for eliminating a position.. Company President Paul Burningham testified that during the 1996 fiscal year the Company was in a financial "free fall," having lost nearly 20% of its forecasted revenues, with a total loss of $580,000. *See* April 28, 1999 Hr'g Tr. at 9. Mr. Burningham testified that he consequently was instructed by his superior in the parent company, Mr. DeWinter, to eliminate a position in the administrative group.[11] *See id.* at 19. While Defendant may have had a legitimate reason for choosing to eliminate a position, it must still establish a defensible basis for selecting Plaintiff as the person to terminate.

ii. Defendant's decision to terminate Plaintiff.

According to the evidence presented, Ms. Nunes made the ultimate decision to lay off Plaintiff. *See* April 27, 1999 Hr'g Tr. at 135; April 28, 1999 Hr'g Tr. at 30. This is significant because, under the mixed motive analysis, the determinative issue is whether the "decisionmaker" can demonstrate that it would have engaged in the employment decision regardless of the discriminatory motive. *See Fernandes,* 199 F.3d at 580 (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring) (" 'What is required [to trigger mixed-motive analysis] is ... direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.' ") (alteration in original)). Here, Company President Paul Burningham testified as to various measures he and his staff took in assessing who to lay off. He testified that the decision came down to two employees, Plaintiff and Charlene Ebberling, and that he favored laying off Plaintiff. In the end, however, he left the decision to Ms. Nunes. *See* April 28, 1999 Hr'g Tr. at 30. That he supported her decision to terminate Plaintiff is irrelevant if Ms. Nunes's decision was improperly colored by a discriminatory motive.

Ms. Nunes's testified that she chose to terminate Plaintiff because of problems with Plaintiff's work performance, and because Plaintiff possessed a narrower range of skills than Charlene Ebberling, who was retained in Plaintiffs position.

(a) Plaintiffs job performance.

As to Plaintiff's job performance, Ms. Nunes testified that Plaintiff failed to pay vendor invoices, that invoices were lost,

---

11. It is noteworthy that President Burningham and Comptroller Nunes provide contradictory accounts of the order to eliminate a position. Ms. Nunes states that she was instructed to eliminate someone from accounting. *See* April 27, 1999 Hr'g Tr. at 139. Mr. Burningham, however, states that the order was to eliminate someone from the administrative group. *See* April 28, 1999 Hr'g Tr. at 19. In addition, Mr. Burningham admitted to being confused by Ms. Nunes's testimony. *See id.* This contradictory testimony raises suspicion about Nunes's proffered explanation of the decision to choose to terminate Plaintiff.

that Plaintiff failed to cross train her replacement before she left for maternity leave, and that she lacked technical competency.[12] *See* April 27, 1999 Hr'g Tr. at 50. The court, however, finds none of these explanations convincing, because Defendant failed to demonstrate a reasonable basis for them. Ms. Nunes testified that when she took over the job of Comptroller she inherited an accounting department in complete disarray. *See id.* at 107. Her predecessor, Neil Dwyer, not only embezzled from the Company, but also failed to oversee the accounting department. *See id.* at 135. Mr. Dwyer neglected to reconcile the general ledger for a period of six to nine months, leaving inaccurate financial statements. *See id.* Given Mr. Dwyer's record of neglect, it is evident that Ms. Nunes attempted to blame Plaintiff for deficiencies that were not justly attributable to her. In doing so, Plaintiff's performance was unfairly maligned in an effort to justify her termination.

First, Defendant does not show that the failure to pay vendor invoices, or loss of vendor invoices, was Plaintiffs fault. Ms. Nunes testified that Plaintiff lost or failed to pay the invoice of one of Defendant's biggest suppliers, resulting in a threat by that supplier to withdraw Defendant's credit. *See id.* at 107. Ms. Nunes later testified that Plaintiff had vendor invoices "hidden away" and failed to turn them over for payment. *See id.* at 150. But, Charlene Ebberling, Plaintiff's replacement while on maternity leave, could not corroborate either of these allegations. *See* April 28, 1999 Hr'g Tr. at 86–87. Ms. Ebberling testified that, in trying to resolve the nonpayment issue, she could not determine whether missing AMP invoices were ever received by Defendant, nor were they found "hidden away" in Plaintiffs of-

fice.[13] *See id.* Furthermore, Plaintiff herself convincingly testified that she put her office in order before her leave, a process that led to her discovery of Mr. Dwyer's embezzlement. *See* April 27 Hr'g Tr. at 19. The issue of missing or unpaid invoices arose shortly after the Comptroller was fired for embezzling, leaving the accounting department in total disarray. Defendant proved only that this problem manifested itself during Plaintiffs maternity leave, and not that it was the result of her malfeasance.

Second, Ms. Nunes complained that Plaintiff neglected to cross-train her replacements, Charlene Ebberling and Dawn O'Sullivan, prior to departing for maternity leave. But, Defendant fails to show that Plaintiff had any duty to cross-train. Ms. Nunes acknowledges in her testimony that there was no written company policy imposing such a duty on Plaintiff. Moreover, Ms. Nunes testified that she had never seen such a policy anywhere she worked during her twenty years of experience. *See* April 27, 1999 Hr'g Tr. at 118. In fact, Ms. Nunes suggests that the prior Comptroller, Neal Dwyer, and perhaps company President Paul Burningham, should have shared some of the responsibility in selecting replacements for Plaintiff during her leave, and in insuring that proper training took place. *See id.* at 111–14. Ms. Nunes admitted, however, that she had no knowledge of what role either officer played in performing these tasks. *See id.* at 111–13. Ms. Nunes's testimony even suggests that perhaps she bears some of the responsibility for any lack of cross-training. Ms. Nunes states that it was Plaintiff's boss who had an obligation to insure that cross-training took place. Significantly, at the time Plaintiff left for leave it was Ms. Nunes who was her boss.

---

**12.** In addition, Ms. Nunes testified as to the improper basis for her decision, Plaintiffs lack of cooperation during her maternity leave. *See id.*

**13.** In so far as there was a problem locating invoices, the problem relates closely to the issue of "cross-training" Plaintiffs replacement (showing where invoices were kept). As discussed below, the cross-training issue is not one for which Plaintiff bears any responsibility.

Ms. Nunes had come into work on June 13, 1996 at the request of Mr. Burningham, because of the urgent need to reverse the damage done by Mr. Dwyer. Yet during that visit, Ms. Nunes made no effort to insure that Plaintiffs duties would be covered, despite full knowledge of Plaintiffs impending leave. *See id.* at 115–18.

Finally, Ms. Nunes complained that Plaintiff lacked technical competency to perform the position. *See id.* at 150. Paul Burningham's testimony explicitly refuted this assertion. He represented to the EEOC that Plaintiff's performance was exactly equivalent to that of Charlene Ebberling, who was retained to fill Plaintiff's position. *See* April 28 1999 Hr'g Tr. at 31–34; Ex. 30. Furthermore, he authored a letter of recommendation stating that Plaintiff "worked well independently, displayed good analytical skills and completed her work accurately." April 27, 1999 Hr'g Tr. at 127 (quoting Ex. 24). While Ms. Nunes states that she disagreed with the letter, it is significant that her only complaints to Mr. Burningham prior to Plaintiff's dismissal concerned Plaintiff's "attitude." *See* April 28, 1999 Hr'g Tr. at 61. In addition, Ms. Nunes acknowledged, and the facts demonstrate, that she never actually worked with Plaintiff. *See* April 27 Hr'g Tr. at 103–05. Ms. Nunes's basis for evaluating Plaintiff's work is the dismal condition of the accounting department when Plaintiff left for maternity leave. Defendant does not show that Plaintiff, as opposed to her former boss Mr. Dwyer, was to blame for that condition. Lastly, Defendant offered to rehire Plaintiff following her discharge, demonstrating confidence in her abilities.[14]

Taken together, this evidence convinces the court that Plaintiff's performance was not deficient, and that this was not a credible basis for the decision to lay off Plaintiff.

### (b) Plaintiffs qualifications.

Defendant also argues that the decision to terminate Plaintiff was justified by the fact that Charlene Ebberling, her replacement, possessed a broader range of skills.[15] The court finds that this justification also lacks credibility. While Defendant presented evidence that Ms. Ebberling possessed certain training that Plaintiff did not, Defendant's complaint that Plaintiff did not adequately cross-train suggests that Plaintiff also possessed unique skills. Defendant cannot have it both ways: if Plaintiff's replacement required training, then that replacement did not possess all the skills necessary to perform Plaintiff's job. It is also suspicious that Defendant replaced Plaintiff with Ms. Ebberling after deciding to terminate Ms. Ebberling's position as Administrative Assistant in the human resources department. *See id.* at 144. Plaintiff thus returned to work to find someone else's job eliminated, with that person reassigned to take her position.

Finally, Mr. Nunes's testimony regarding her decision to retain Ms. Ebberling over Plaintiff further demonstrates the presence of an improper motive. Ms. Nunes was asked "[W]hat was it about Charlene [Ebberling] that made you choose to keep her instead of keeping Debbie Sherman?" She responded:

Charlene, her work was exemplary. She was a very good worker. She was

---

**14.** Ms. Nunes states that she believed that Plaintiff could perform the accounting tasks required in the positions offered (many of the same Plaintiff had previously performed) if Plaintiff was managed well. *See* April 27 Hr'g Tr. at 156. Once again, Ms. Nunes, seems to ignore that fact that Plaintiff was previously functioning in an accounting department where the Comptroller was embezzling instead of managing. Defendant submits no evidence to corroborate the blame

Ms. Nunes placed on Plaintiff for the state of the accounting department, when by all accounts the blame belonged to Comptroller Dwyer.

**15.** Defendant also asserts that Ms. Ebberling was retained in part because of her seniority. No evidence was adduced, however, to suggest that this was itself a sufficient reason to retain Ms. Ebberling instead of Plaintiff.

very productive. She was very accurate. She was very timely. She had a very pleasant attitude. She was very cooperative. I had no problems in her work at all.

She got along with everyone. She was under a lot of pressure at the company, and I found her to be just very pleasant, and I could depend upon her work.

As to the comments about the quality of the work, the court has already concluded that there is no basis for distinguishing between the work performed by Plaintiff and Ms. Ebberling. This argument is precluded by Paul Burningham's letter to the EEOC stating that they both performed at exactly the same level. It is clear from the remainder of Ms. Nunes response that the she favored Ms. Ebberling because of her attitude and disposition. In other words, Plaintiff's skills were evaluated negatively against Ms. Ebberling because of Plaintiffs "attitude" while on leave. That this consideration weighed against Plaintiffs ability, or qualifications to do her job, taints that basis for choosing to terminate Plaintiff.

Under the second step of the *Price Waterhouse* mixed motive analysis, Defendant was obliged to show that it would have terminated Plaintiff regardless of its illegitimate motive. Defendant has not done so. The court finds the explanations offered to lack credibility. Instead, the court finds that Ms. Nunes was deeply upset with Plaintiffs refusal to work during her maternity leave and decided to terminate her for that reason. As such, the court finds in Plaintiffs favor and awards damages as discussed below.

### 2. The *McDonnell Douglas* Analysis.

■ The *McDonnell Douglas* approach varies from that of *Price Waterhouse* in that it "allocates the burdens of production and persuasion in accordance with a three step procedure." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 800–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). First, a court will presume discrimination where the plaintiff establishes a prima facie case. *See id.* (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). The burden then shifts to the employer to show some legitimate, non-discriminatory reason for the adverse action. *See id.* Finally, if the employer creates a genuine issue of material fact, the presumption of discrimination drops from the case, and the Plaintiff then bears the final burden of proving that the employer's basis for the adverse action was a pretext for discrimination or retaliation. *See id.* (quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817).

### a. Plaintiff's prima facie case.

In order to establish her prima facie case, Plaintiff must show that (1) she asserted "a protected right under the FMLA; (2)[she] was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Id.* at 161 (citing *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir.1997); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir.1997)). Here, there is no dispute as to the first two elements. Defendant concedes that the FMLA covered Plaintiff's leave. *See* Def's. Request for Rulings of Law at ¶ 2. Further, her termination constitutes an adverse employment decision.

Plaintiff satisfied the third element of the prima facie case, a causal connection between Plaintiffs use of FMLA maternity leave and her termination, through the testimony of her supervisor, Ms. Nunes. As outlined in detail above, Ms. Nunes's testimony alone supports a finding of discriminatory motive.

### b. D's Justification

While Defendant's nondiscriminatory explanation for terminating Plaintiff proved unconvincing, it satisfies the burden of

production imposed at step two of the *McDonnell Douglas* analysis. *See Hodgens,* 144 F.3d at 166 ("[I]n order to rebut the presumption that arises ... the employer need only produce enough competent evidence which, if taken as true, would permit a rational factfinder to conclude that the challenged employment action was take for a 'legitimate, nondiscriminatory reason.'").

### c. Pretext

Finally, under the *McDonnell Douglas* analysis, Plaintiff has the burden of showing that Defendant's explanation was a pretext used to conceal a discriminatory motive. As discussed above, the testimony of Ms. Nunes was inconsistent, and was contradicted by that of the other witnesses on key points. The evidence showed that Defendant's claims that Plaintiff performed at an inadequate level, that she failed to cross-train, and that she possessed inferior skills, all lack merit. The evidence thus established that Defendant's nondiscriminatory explanation lacked credibility, and that the proffered explanation was a pretext. *See, e.g., Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir.2000) ("[W]hen a company, at times, gives different and arguably inconsistent explanation, a jury may infer that the articulated reasons are pretextual."); *Hodgens,* 144 F.3d at 168 (A plaintiff can succeed by showing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the defendant's proffered legitimate reasons.).

The court concludes, therefore, that Plaintiff's FMLA claim also succeeds under the *McDonnell Douglas* framework.

### 3. Damages Under FMLA

Under the FMLA, Plaintiff is entitled to damages equal to "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation," plus interest. 29 U.S.C. § 2617(a)(1)(A)(i) and (ii). In addition, that award is doubled as liquidated damages unless Defendant proves that the violation was in good faith; i.e., that it reasonably believed that Plaintiff's termination was not a violation of the Act. *See id.* § 2617(a)(1)(A)(iii). Lastly, Plaintiff is entitled to reasonable attorney's fees and costs. *See id.* § 2617(a)(3).

Defendant makes two arguments to limit its liability: first, that Plaintiff failed to mitigate her damages; and second, that liquidated damages are not warranted. Both arguments fail.

■ While this Circuit has not addressed whether a duty to mitigate exists under the FMLA,[16] the court finds that, assuming such a duty exists, Plaintiff met this obligation. "There are limits to the duty to mitigate: to satisfy the duty to mitigate, 'the unemployed ... need not go into another line of work, accept a demotion or take a demeaning position.'" *Miller v. AT & T,* 83 F.Supp.2d 700, 706 (S.D.W.V.2000) (quoting *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)). Here, the only evidence of a failure to mitigate is Plaintiffs denial of Defendant's job offers. Defendant failed to prove, however, that the positions were substantially similar to Plaintiff's previous work. The first offer was part time and did not provide benefits. The second included duties as a receptionist, a position Plaintiff had never before performed. Plaintiff is not obliged to accept positions dramatically different from the one she held. *See Ford,* 458 U.S. at 231–32, 102 S.Ct. 3057 (plaintiff forfeits right to back pay only if he refuses a substantially equivalent position).

■ As for limiting the availability of liquidated damages, the court concludes

---

16. *See, e.g., Thorson v. Geminin, Inc.,* 96 F.Supp.2d 882, 889–891 (N.D.Iowa 1999)(discussing duty to mitigate in FMLA claim); *Viereck v. City of Gloucester,* 961 F.Supp. 703, 709 (D.N.J.1997) (denying summary judgment because of question of fact regarding duty to mitigate in FMLA claim).

that Plaintiff's termination was not in good faith. Company President Paul Burningham testified that Defendant carefully considered its FMLA obligations and chose to terminate Plaintiff based on a nondiscriminatory motive. But, it is the mind-set of the ultimate decisionmaker, Ms. Nunes, that controls. Because Ms. Nunes's decision was improperly colored with a discriminatory motive, and because her attempt to offer nondiscriminatory justifications lacked credibility, the court finds that liquidated damages here are appropriate.

 The court concludes, therefore, that Plaintiff is entitled to the wages she would have received from her date of termination, September 5, 1996, through the date of this judgement. From that amount shall be deducted wages and unemployment compensation earned during the same period. In addition, Plaintiff is also entitled to restoration of benefits that she would have received. Included therein are the damages she sustained because of the termination of her health insurance benefits, or $11,100, minus any deductibles, copayments or premiums that she would have been required to pay. Further, Plaintiff shall receive statutory interest. Finally, this amount shall be doubled as liquidated damages under 29 U.S.C. § 2617(A)(1)(a)(iii).

The parties shall have 30 days to supplement the record to provide the court with the sum total of wages and unemployment compensation received since Plaintiff's termination, the amount to be deducted from damages associated with the termination of her health insurance, and the prevailing rate of interest. Additionally, Plaintiff shall submit an application for reasonable attorney's fees and costs.

B. Plaintiff's COBRA Claim

 Plaintiff's second claim seeks damages for Defendant's failure to properly notify her of her rights under COBRA. Plaintiff advances two distinct theories. First, she argues that Defendant violated the coverage requirements of COBRA, 29 U.S.C. § 1161, by conditioning receipt of her right to continued coverage upon the signing of a release of all claims against Defendant. Plaintiff presents no evidence to support this claim. *See* April 27, 1999 Hr'g Tr. at 4446. Second, Plaintiff asserts that Defendant failed to give proper notice of her rights under COBRA, 29 U.S.C. § 1166. As a result of this faulty notice, Plaintiff claims that she was unable to pay her accrued premium, that her insurance coverage was canceled, and that she subsequently received medical bills for an appendectomy totaling $11,100, which she was unable to pay. Plaintiffs second theory fails, however, because she does not show that the late notice actually caused any damages. Plaintiff's inability to pay three months of premiums arose in December. Plaintiff produced no evidence that she made any efforts to secure assistance in paying her premiums once notice arrived from Defendant in early October 1996, or that this delay directly prevented her from ultimately making payment in December 1996. Furthermore, even if Plaintiff tendered such proof, the damages she seeks will be compensated under her FMLA claim. As such, Plaintiff has not established an independent claim under COBRA.

### III. Conclusion

For the reasons discussed above, the court finds for Plaintiff on her claim under FMLA, and for Defendant on the claim under COBRA. The court shall issue an Order specifying damages following the parties post-verdict submissions.

AN ORDER SHALL ISSUE.

### *ORDER*

The court hereby orders as follows:

(1) Judgement shall be entered in favor of Plaintiff on Count I;

(3) Judgement shall be entered in favor of Defendant on Count II;

(4) The Parties shall file supplemental briefing on damages by June 23, 2000;

(5) Plaintiff shall submit an application for attorney's fees by June 23, 2000; and

(6) Defendant's Motion to Strike [# 49] is DENIED.

IT IS SO ORDERED.